**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

**FILED**

MAY 1 3 2002

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

Cooperative Computing, Inc., d/b/a
CCITRIAD,

       Plaintiff,

v.

CarParts Technologies, Inc.

       Defendant.

CASE NO. **A02CA 316 JN**

## PLAINTIFF'S ORIGINAL COMPLAINT

1.     By this Complaint, Plaintiff Cooperative Computing, Inc., d/b/a CCITRIAD, Inc. ("CCITRIAD") seeks to recover damages sustained as a result of Defendant CarParts Technologies, Inc.'s ("CarParts") infringement of CCITRIAD's copyrights, misappropriation of CCITRIAD's trade secrets, business disparagement, tortious interference with CCITRIAD's contracts, and interference with CCITRIAD's prospective economic advantage. CCITRIAD is also seeking injunctive relief to enjoin Defendant from continuing to use CCITRIAD's software in an unlawful manner, from continuing to use CCITRIAD's proprietary material, from continuing to wrongfully disparage CCCITRIAD and from interfering with CCITRIAD's current contracts and prospective business relationships.

*1*

# I.
# PARTIES

2.     CCITRIAD is and at all relevant times has been, a Delaware Corporation with its principal place of business at 804 Las Cimas Parkway, Suite 200, Austin, TX 78746-5179.

3.     CCITRIAD is informed and believes, and thereon alleges, that Defendant is a Delaware corporation with its principal place of business at 222 N. Sepulveda Blvd., Suite 1100, El Segundo, CA 90245-5603.

# II.
# JURISDICTION

4.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 1338(a) and (b), the Copyright Act of 1976, 17 U.S.C. § 101 et seq.  Jurisdiction over the state law claims is also appropriate under principles of supplemental jurisdiction, 28 U.S.C. § 1367.

5.     Venue in this Court is proper under 28 U.S.C. § 1391.

# III.
# FACTUAL ALLEGATIONS

6.     CCITRIAD is the leading designer, provider, and servicer of computer hardware, software and databases for the automotive aftermarket industry.  The automotive aftermarket industry consists of manufacturers, distributors, service dealers and parts retailers trading in automotives parts, accessories, lubricants, chemicals, tires and repair services.  CCITRIAD's hardware and software systems for the automotive aftermarket industry are enhanced by extensive information services featuring highly specialized database products and customer support and maintenance services.  CCITRIAD's products provide end-users a backbone data-management system that can manage multiple inventories representing different product lines from different suppliers at multiple locations.  Each system sells for more that $75,000.

7.     CCITRIAD is the exclusive owner of computer hardware and software products known as the CCITRIAD Ultimate System for handling multiple car part and car product inventories. The software component of the CCITRIAD Ultimate system is known as "the Ultimate Software" and consists of a UNIX-based operating system and database management program, as well as CCITRIAD's proprietary databases. CCITRIAD owns all rights, titles and interests in and to the copyright and other proprietary information relating to the Ultimate Software.

8.     CCITRIAD obtained a Certificate of Registration for the CCITRIAD Ultimate Software from the United States Register of Copyrights, which bears registration number TXu1-027-083. A true and correct copy of this registration certificate is attached hereto as Exhibit "A."

9.     CCITRIAD acquired the rights to the Ultimate Software by purchasing them from Ultimate in 1992. As part of the transaction, CCITRIAD employed several developers and others who had been employed by Ultimate, including Mr. Chuck Ruban. Ruban remained employed by CCITRIAD for several years following the acquisition of Ultimate by CCITRIAD. During his employment by CCITRIAD, Ruban had access to the source code of the Ultimate Software, as well as access to CCITRIAD's customer lists and other proprietary data.

10.     Upon information and belief, upon ending his employment with CCITRIAD, Ruban took proprietary data and confidential information from CCITRIAD.

11.     After he left CCITRIAD Ruban formed a competing company called CRCS. CRCS developed and sold a product that contained many of the same features and functionality as CCITRIAD's Ultimate Software, but CCITRIAD had no way of knowing whether the CRCS code was similar to the Ultimate Software code.

12.     Following the acquisition of CRCS by Defendant CarParts Technologies,

CCITRIAD learned, during the course of converting a former CRCS customer to the Ultimate

System in 2001, that the CRCS code was identical to the Ultimate Software code.

13.     To control the flow of and access to its Software Products and Hardware Products,

CCITRIAD employs a series of agreements, including the Warehouse System Products and

Services Agreements (the "Ultimate Agreements").

14.     Pursuant to the Ultimate Agreements, CCITRIAD grants customers a non-

exclusive, personal, non-transferable license to use the Ultimate Software in accordance with the

terms of the Ultimate Agreements.  A true and correct copy of a typical Ultimate Agreement is

attached hereto as Exhibit "B."

15.     Specifically, the Ultimate Agreements provide, in pertinent part, that:

3.     **SOFTWARE AND DATABASE LICENSE; FEES.**

> 3.1     *Grant of License.*  Subject to and in consideration of the
> terms and conditions of this Agreement, including without limitation
> Customer's payment of all license fees, CCITRIAD hereby grants
> Customer a non-exclusive, personal, non-transferable right to Use the
> Software Products and Databases Products in accordance with the terms
> and conditions of this Agreement.  This license is furnished to Customer
> for Customer's own use and not for sale or sublicense.  Except for the
> rights granted in this Section 3 ("License"), no other rights whatsoever are
> granted to Customer with respect to the Software Products.

16.     CCITRIAD is informed and believes, and thereon alleges, that Defendant CarParts

has developed a UNIX-based operating system/database management software that is copied

from the Ultimate Software.

17.     CCITRIAD is informed and believes, and thereon alleges that Defendant has

targeted CCITRIAD's customers and prospective customers and is offering to sell its "duplicate"

of the Ultimate Software.

18. CCITriad is informed and believes, and thereon alleges that CarParts has developed an application known as PartsXchange that allows CarParts to access proprietary database information from the Ultimate Software by using a technique known as "screen scraping." Screen scraping is the use of a computer program to capture data from a system like the Ultimate Software that was not designed to be displayed or transported out of the system. Specifically, upon information and belief, CCITRIAD alleges that the PartsXchange application allows anyone with access to a CCITRIAD Ultimate System to obtain confidential information relating to pricing of individual items and the margins the seller maintains on those items. CarParts has used its PartsXchange application to access the proprietary database information provided to CCITRIAD customers as part of the Ultimate Agreements, in violation of those agreements.

19. CCITRIAD is informed and believes, and thereon alleges, that Defendant has made disparaging statements regarding the CCITRIAD Ultimate Software and CCITRIAD's price structure to CCITRIAD's customers.

20. All of these acts of Defendant were and are being performed without the permission or consent of CCITRIAD.

21. The harm to Plaintiff, in the form of lost revenues and lost good will, is a direct and proximate result of the above-described malicious acts of CarParts. Plaintiff is informed and believes, and thereon alleges, that CarParts' acts of infringement are willful.

22. Plaintiff's damages are continuing and Plaintiff has no adequate remedy at law.

## IV.
## CAUSES OF ACTION

For its causes of action, CCITRIAD alleges the following:

4

## FIRST CLAIM
## (Copyright Infringement)
## (17 U.S.C. § 501 et seq.)

23.     CCITRIAD incorporates by reference the allegations in the preceding paragraphs of this Complaint, as though fully set forth herein.

24.     By means of the actions complained of herein, Defendant CarParts has infringed and will continue to infringe CCITRIAD's copyrights by selling, offering to sell and marketing a software product that was copied from CCITRIAD's copyrighted Ultimate Software.

25.     Defendant CarParts has also infringed and will continue to infringe CCITRIAD's copyrights by "screen scraping" proprietary data from the Ultimate Software products.

26.     CCITRIAD is entitled to an injunction restraining Defendant, its officers, agents and employees, and all persons acting in concert with them, from engaging in further such acts in violation of the copyright laws.

27.     CCITRIAD is further entitled to recover from Defendant the damages it has sustained and will sustain as a result of Defendant's wrongful acts as alleged herein. The amount of such damages cannot be determined at this time. CCITRIAD is further entitled to recover from Defendant the gains, profits and advantages it has obtained as a result of its wrongful acts alleged herein. CCITRIAD is at present unable to determine the full extent of the gains, profits, and advantages Defendant has obtained by reason of their aforesaid acts of copyright infringement.

## SECOND CLAIM
## (Misappropriation of Trade Secrets)

28.     CCITRIAD incorporates the allegations in the preceding paragraphs of this Complaint, as though fully set forth herein.

5

29. CarParts has acquired through tortious misappropriation and has unlawfully and commercially used for its benefit plaintiff's confidential trade secrets. Defendant did not discover plaintiff's trade secrets by reverse engineering or independent research, but rather obtained this confidential information through deviousness.

30. Ruban's unprivileged use and disclosure of CCITRIAD's trade secrets constitutes a breach of confidence entrusted in him while employed by CCITRIAD. Ruban was on notice that CCITRIAD desired that confidential and trade secret information be kept secret.

31. Defendant's tortious misappropriation of plaintiff's trade secrets and confidential information has proximately caused, and unless enjoined, will continue to cause plaintiff irreparable harm for which there exists no adequate remedy at law. In addition, such misappropriation has otherwise damaged plaintiff. As a result of defendant's fraudulent or malicious misappropriation of plaintiff's trade secrets, plaintiff seeks an injunction and actual damages, including the actual value of what has been appropriated, together with past and future lost profits, punitive damages and or liquidated damages.

## THIRD CLAIM
### (Business Disparagement)

32. CCITRIAD incorporates the allegations in the preceding paragraphs of this Complaint, as though fully set forth herein.

33. Defendant CarParts has called on, solicited, sold and offered to sell a duplicate version of the Ultimate Software. Defendant CarParts has also made disparaging statements regarding the Ultimate Software and CCITRIAD's price structure relating to the Ultimate Software to CCITRIAD's customers.

34. As a result of defendant's conduct, defendant has been unjustly enriched. CCITRIAD has also suffered and will continue to suffer money damages due to lost sales as well

as irreparable harm to its business reputation, good will, and stature in the business community. This harm cannot be adequately compensated by money damages, and CCITRIAD has no other adequate remedy at law. Therefore, CCITRIAD seeks restitution, compensatory damages and preliminary and permanent injunctive relief.

35. CCITRIAD alleges on information and belief that defendant's actions as alleged herein are false, malicious and unprivileged.

## FOURTH CLAIM
### (Intentional Interference with Contract)

36. CCITriad incorporates the allegations in the preceding paragraphs of this Complaint, as though fully set forth herein.

37. CCITRIAD has existing contractual relations with its customers. CCITRIAD alleges on information and belief that at all relevant times, defendant was aware of the contractual relationships with customers that CCITRIAD held through the exclusive Ultimate Agreements and through its relationship with long-time customers, as well as through CCITRIAD's investments in service as well as in storage, distribution, and other facilities installed at the customer's premises. Such contractual relationships were and are known by defendant CarParts by virtue of Ruban's prior employment with CCITRIAD and his access to CCITRIAD's confidential customer information.

38. In using its PartsXchange program, CarParts induced CCITRIAD's customers to breach their obligations to CCITRIAD under the Ultimate Agreements. In calling on, soliciting, selling and offering to sell a duplicate version of the Ultimate Software, as well as making disparaging statements regarding the Ultimate Software and CCITRIAD's price structure relating to the Ultimate Software to CCITRIAD's customers, defendant CarParts has willfully and intentionally interfered, without privilege or justification, with the existing contractual and

7

business relationships between these customers and plaintiff.

39.    Defendant CarParts' tortuous interference has directly and proximately caused plaintiff irreparable harm for which there exists no adequate remedy at law, unless CarParts is enjoined. In addition, CarParts' tortuous interference with plaintiff's business and contractual relations has proximately caused damage to plaintiff, including lost profits, lost goodwill, and the impairment of plaintiff's future earning capacity. Therefore, CCITRIAD seeks restitution and compensatory damages.

## FIFTH CLAIM
### (Interference With Prospective Economic Advantage)

40.    CCITRIAD incorporates the allegations in the preceding paragraphs of this Complaint, as though fully set forth herein.

41.    CCITRIAD alleges on information and belief that at all relevant times, defendant was aware of the economically advantageous relationships with customers that CCITRIAD held through the exclusive Ultimate Agreements and through its relationship with long-time customers, as well as through CCITRIAD's investments in service as well as in storage, distribution, and other facilities installed at the customer's premises. Such business relationships were and are known by defendant CarParts by virtue of Ruban's prior employment with CCITRIAD and his access to CCITRIAD's confidential customer information.

42.    In calling on, soliciting, selling and offering to sell a duplicate version of the Ultimate Software, as well as making disparaging statements regarding the Ultimate Software and CCITRIAD's price structure relating to the Ultimate Software to CCITRIAD's customers, defendant CarParts has willfully and intentionally interfered, without privilege or justification, with the existing contractual and business relationships between these customers and plaintiff.

43. The actions of defendant as set forth herein constitute wrongful interference with CCITRIAD's prospective economically advantageous relationships with its customers.

44. As a proximate result of defendant's interference with CCITRIAD's prospective economic advantage, CCITRIAD has been damaged in an amount to be proven at trial.

45. Unless restrained by order of this court, defendant will continue to disrupt the above described economic advantage of CCITRIAD, to CCITRIAD's great and irreparable injury, for which damages will not afford adequate relief in that such damages will not compensate CCITRIAD for injuries to its business reputation and good will. Therefore, CCITRIAD seeks preliminary and permanent injunctive relief.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands that this matter be tried by a jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff CCITRIAD prays for the following relief:

1. For general damages according to proof;

2. For special damages according to proof;

3. For restitution according to proof;

4. For attorney's fees to the extent permitted by contract or law;

5. For pre-judgment and post-judgment interest;

6. For costs of suit;

7. For an injunction restraining the wrongful acts of Defendant described herein; and

8. For such other relief as the court deems just and proper.

Respectfully submitted,

Dated: May 13, 2002

By: _____

**GRAY CARY WARE & FREIDENRICH** LLP
Alan Albright
State Bar No. 00973650
Patrick R. Richter
State Bar No. 00791524
1221 S. MoPac Expressway, Suite 400
Austin, TX 78746
Tel: 512-457-7000
Fax: 512-457-7001

ATTORNEYS FOR PLAINTIFF
COOPERATIVE COMPUTING, INC.
D/B/A CCITRIAD

AU\4084037 1
2501115-1

Tab. 4

# CERTIFICATE OF REGISTRATION



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

REGISTER OF COPYRIGHTS
*United States of America*

OFFICIAL SEAL

## FORM TX
For a Nondramatic Literary Work
UNITED STATES COPYRIGHT OFFICE



TXu 1 ~ 027 ~ 083

EFFECTIVE DATE OF REGISTRATION

Month **Apr** Day **13** Year **2001**

---

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**1**

TITLE OF THIS WORK ▼

   CCI/Triad Ultimate Software

PREVIOUS OR ALTERNATIVE TITLES ▼

   ULT-PLUS

PUBLICATION AS A CONTRIBUTION If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared    Title of Collective Work ▼

If published in a periodical or serial give:   Volume ▼    Number ▼    Issue Date ▼    On Pages ▼

**2**

**a** NAME OF AUTHOR ▼

   Cooperative Computing, Inc.

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☒ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶    U.S.
Domiciled in ▶               

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? ☐ Yes ☒ No   If the answer to either of these questions is "Yes," see detailed instructions.
Pseudonymous? ☐ Yes ☒ No

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼
   Computer program

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b** NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶          
Domiciled in ▶          

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? ☐ Yes ☐ No   If the answer to either of these questions is "Yes," see detailed instructions.
Pseudonymous? ☐ Yes ☐ No

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c** NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶          
Domiciled in ▶          

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous? ☐ Yes ☐ No   If the answer to either of these questions is "Yes," see detailed instructions.
Pseudonymous? ☐ Yes ☐ No

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

**3**

**a** YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED This information must be given in all cases.
   2001 ◀ Year

**b** DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information ONLY if this work has been published.
Month ▶    Day ▶    Year ▶      ◀ Nation

**4**

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼

   Cooperative Computing, Inc.
   804 Las Cimas Parkway, Suite 200
   Austin, TX 78746

See instructions before completing this space.

TRANSFER If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

APPLICATION RECEIVED
APR 13 2001
ONE DEPOSIT RECEIVED
APR 13 2001
TWO DEPOSITS RECEIVED

FUNDS RECEIVED

DO NOT WRITE HERE OFFICE USE ONLY

MORE ON BACK ▶ • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions. • Sign the form at line 8

DO NOT

Page 1 of _____

EXAMINED BY ⟋                                                    FORM TX

CHECKED BY

☐ CORRESPONDENCE
   Yes

FOR
COPYRIGHT
OFFICE
USE
ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes ☒ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application

If your answer is "Yes," give: Previous Registration Number ▶                    Year of Registration ▶

**5**

**DERIVATIVE WORK OR COMPILATION**

Preexisting Material  Identify any preexisting work or works that this work is based on or incorporates. ▼

   Ultimate Corporation's Ultimate Software

**a**

**6**

See instructions before completing this space

Material Added to This Work  Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

   CCI/Triad enhancements, additions and improvements

**b**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

Name ▼                                        Account Number ▼

**a**

**7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent  Name/Address/Apt/City/State/ZIP ▼

   Andrew G. DiNovo
   Vinson & Elkins, LLP
   1001 Fannin, Suite 2300
   Houston, TX 77002

Area code and daytime telephone number ▶  512-495-8521                    Fax number ▶ ▶ 512-236-3248

Email ▶

**b**

**CERTIFICATION*** I, the undersigned, hereby certify that I am the

Check only one ▶

☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☒ authorized agent of _ Cooperative Computing, Inc.

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

   Andrew G. DiNovo                                        Date ▶ April 6, 2001

Handwritten signature (X) ▼

X _Andrew D_

**CERTIFICATION**

Certificate will be mailed in window envelope to this address:

Name ▼  Andrew G. DiNovo  Vinson & Elkins, LLP

Number/Street/Apt ▼  1001 Fannin, Suite 2300

City/State/ZIP ▼  Houston, TX  77002

**YOU MUST:**
• Complete all necessary spaces
• Sign your application in space 8

**SEND ALL 3 ELEMENTS IN THE SAME PACKAGE**
1. Application form
2. Nonrefundable filing fee in check or money order payable to Register of Copyrights
3. Deposit material

**MAIL TO**
Library of Congress
Copyright Office
101 Independence Avenue, S.E.
Washington, D.C. 20559-6000

As of July 1, 1999, the filing fee for Form TX is $30

**9**

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

June 1999—200,000                                        U.S. GOVERNMENT PRINTING OFFICE: 1999 454-879/48
WEB REV: June 1999



# WAREHOUSE SYSTEM PRODUCTS AND SERVICES AGREEMENT

This System Warehouse Products and Services Agreement ("Agreement") is entered into between Cooperative Computing, Inc., a Delaware corporation ("CCI/Triad"), and the customer named below ("Customer").

1. *Purpose.* The purpose of this Agreement is to make available to Customer in accordance with the terms and conditions of this Agreement (a) computer hardware, (b) software and database products and services, and (c) a subscription to hardware and software support services.

2. *Structure of this Agreement.* This Agreement consists of this Cover Page, the "Terms and Conditions," the attached exhibits. Capitalized terms will have the meanings ascribed for them in this Agreement.

3. *Effective Date.* The effective date of this Agreement is _____, 20____ ("Effective Date").

IN WITNESS WHEREOF, the parties have executed this Agreement through their duly authorized representatives as of the Effective Date.

COOPERATIVE COMPUTING, INC.                     CUSTOMER:

By: _____                By: _____

Name: _____                Name: _____

Title: _____               Title: _____

Address for Notices:                            Address for Notices:

Cooperative Computing, Inc.                     _____
804 Las Cimas Pkwy., Suite 200                  _____
Austin, TX 78746                                _____
Attn:    President, Automotive Division         _____
Copy to:  General Counsel

                                                Address for Shipping ("Shipping Location"):

                                                _____
                                                _____
                                                _____



# TERMS AND CONDITIONS

1.  **DEFINITIONS.** Capitalized terms used in this Agreement will have the following meanings:

1.1 *"Additional Services"* will refer to services provided by CCI/Triad to Customer in addition to Hardware Support Services and Software Support Services, including, by way of example only, support services relating to operating systems software and computer hardware. Additional Services may be the subject of a separate agreement entered into by Customer and CCI/Triad.

1.2 *"CCI/Triad Hardware"* will mean computer hardware, other than Vendor Hardware, acquired by Customer from CCI/Triad under the terms and conditions of this Agreement, as further identified on *Exhibit B.*

1.3 *"Databases"* will mean the databases (including any supplements and modifications thereto), if any, provided by CCI/Triad to Customer, identified on *Exhibit E.*

1.4 *"Database Products"* will mean the Database(s) and any associated documentation provided by CCI/Triad.

1.5 *"Date of Installation"* will refer to whichever occurs first of the date that the Hardware and the Software Products are (a) installed; (b) available for delivery to Customer but Customer delays such delivery; or (c) delivered to Customer but Customer fails to provide a suitable installation environment or otherwise delays installation.

1.6 *"Documentation"* will refer to CCI/Triad's standard user documentation for the operation of the Software and Databases.

1.7 *"Enhancements"* will mean logical improvements, new features, or extensions to the Software, as determined by CCI/Triad, and which are supplied to Customer under this Agreement. CCI/Triad may charge Customer an additional license fee for Enhancements.

1.8 *"Hardware"* will mean collectively the computer hardware acquired by Customer from CCI/Triad under this Agreement, as identified on *Exhibit B,* as may be amended from time-to-time. Hardware includes Vendor Hardware and CCI/Triad Hardware.

1.9 *"Hardware Support List"* will mean the list signed by CCI/Triad and Customer and of the form set forth on *Exhibit C,* as may be amended from time to time. The initial Hardware Support List is set forth on *Exhibit C.*

1.10 *"Hardware Support Services"* will mean the support services described in Section 6.2.

1.11 *"Products"* will mean the Hardware, Software Products and Database Products provided by CCI/Triad to Customer under this Agreement.

1.12 *"Proprietary Rights"* will mean all patents, patent applications, trade secrets, copyrights, technology, service marks, trademarks, related goodwill, know-how and other proprietary and confidential information, worldwide.

1.13 *"Site"* will mean the Shipping Location indicated on the first page of this Agreement, or such other site(s) as Customer may request (pursuant to a purchase order or other writing) and CCI/Triad approves in writing.

1.14 *"Software"* will mean the object code version of the CCI/Triad Ultimate system application software current as of the Effective Date and any CCI/Triad application software modules identified on *Exhibit D,* together with any Updates and Enhancements to such software, provided by CCI/Triad to Customer. "Software" may include software developed by CCI/Triad as well as software licensed by CCI/Triad from third parties.

1.15 *"Software Products"* will mean the Software and the Documentation



1.16    *"Software Support Services"* will mean the support services described in Section 6.1.

1.17    *"Support Services"* will mean the Hardware Support Services and Software Support Services.

1.18    *"Supported Hardware"* will mean the computer hardware identified in a then-current Hardware Support List.

1.19    *"Supported Products"* will mean the Supported Hardware and Software.

1.20    *"Territory"* will mean the United States of America.

1.21    *"ULT PLUS Software"* will mean the UNIX-based operating system/database management software marketed under the name "ULT PLUS".

1.22    *"Updates"* will mean non-feature improvements, workarounds, bug-fixes, media replacements and/or corrections to the Software Products.

1.23    *"Use"* will mean, with respect to any portion of the Software, (a) copying the portion into or transmitting it to the Hardware for processing of machine instructions, statements or data; (b) storing that portion in, transmitting it to, or displaying it on, peripheral units of the Hardware; and (c) copying the Software in machine-readable form as reasonably required for backup or archival purposes.

1.24    *"Used Hardware"* will mean Hardware which was previously-owned by a third party and which may contain remanufactured subassemblies or parts. Used Hardware will be identified as such on *Exhibit B*, and the terms and conditions of this Agreement specifically related to Used Hardware shall apply.

1.25    *'Vendor Hardware"* will mean certain Hardware acquired by Customer under this Agreement which is identified as "Vendor Hardware" on *Exhibit B*. Vendor Hardware may be new or used.

**2.     HARDWARE PURCHASE AND SALE; TERMS.**

2.1    *Agreement to Purchase and Sell.*  Customer agrees to purchase from CCI/Triad, and CCI/Triad agrees to sell to Customer, the Hardware under the terms and conditions of this Agreement.

2.2    *Price.*  Customer agrees to pay CCI/Triad the price of the Total Hardware Investment set forth on *Exhibit A* (accounting for any discount on the Initial System Price set forth on *Exhibit A*).

2.3    *Title; Transfer.*  CCI/Triad will transfer title to the Hardware to Customer or Customer's third party financing institution, as applicable, upon receipt of all payments due from Customer for the Hardware.

**3.     SOFTWARE AND DATABASE LICENSE; FEES.**

3.1    *Grant of License.*  Subject to and in consideration of the terms and conditions of this Agreement, including without limitation Customer's payment of all license fees, CCI/Triad hereby grants Customer a non-exclusive, personal, non-transferable right to Use the Software Products and Databases Products in accordance with the terms and conditions of this Agreement. This license is furnished to Customer for Customer's own use and not for sale or sublicense. Except for the rights granted in this Section 3 ("License"), no other rights whatsoever are granted to Customer with respect to the Software Products. .

3.2    *License Restrictions.*  Customer is permitted to Use the Software Products and Database Products solely in conjunction with the Hardware and only at the Site(s), unless otherwise approved by CCI/Triad in writing, and exclusively for Customer's own internal operations, it being understood, however, that Customer may access the Software from Customer owned remote locations in connection with its internal Use of the Software, provided that any such access via a network shall be only as permitted under Section 3.3. Customer further agrees that the Software Products and Database Products shall only be Used by Customer and not directly or indirectly by any other firm, corporation, individual or enterprise, other than in conjunction with CCI/Triad's TelePart® or On-Line Jobber™ applications. Customer understands and agrees that each TelePart or On-Line Jobber port is to be used only for a Direct Connection to a single customer at any given time strictly for parts inquiry and order placement in the ordinary course of such customer's business. "Direct Connection" means a connection in which the CCI/Triad Ultimate system at the Site is directly linked to a single device or business management system physically located at the



customer's normal business location solely by means of a publicly switched telephone network, and does not include access through a web server or other networked computer system. Except as otherwise provided in this Agreement, Customer shall not copy, reproduce, duplicate or translate, in whole or in part, the Software Products or Database Products without the prior written permission of CCI/Triad.

3.3 *Remote Customer Access.* Subject to the terms and conditions of this agreement and payment of any applicable fees, Customer may provide remote access to the Databases through CCI/Triad-provided software to automotive parts sales outlets owned and operated by Customer in the ordinary course of its business ("Remote Sites") via a web server at the Site using a firewall that has been approved in writing by CCI/Triad and that prevents unauthorized access and access by computers with unknown IP addresses. Customer agrees not to permit access by any other party or to any location other than a Remote Site. If Customer becomes aware of any access not permitted under this Section 3.3, Customer agrees to (i) immediately disable all Database access from the server until further unauthorized access can be prevented; and (ii) provide CCI/Triad with prompt written notice of the unauthorized access, including particulars of each occurrence.

3.4 *New Location/New Equipment.* Customer may not transfer the operation of the Software to a site other than the Site or to hardware equipment other than the Hardware without the advance written consent of CCI/Triad. Within 30 days after any such transfer, Customer must certify in writing that all copies of the Software have either been destroyed or transferred to the new site or hardware.

3.5 *Access.* Customer hereby grants CCI/Triad access to, and the right to use, reproduce, modify, market and distribute statistical information automatically generated and stored by the Software in connection with Customer's Use of the Software, provided that CCI/Triad does not unreasonably interrupt Customer's operation of the Software and does not disclose Customer's identity (whether expressly or by implication based upon the nature of the distributed reports or analyses) in any reports or analysis distributed to third parties.

3.6 *Database Updating Service.* Subject to the terms and conditions of this Agreement, CCI/Triad will from time-to-time update and release revised Databases to correct previous errors and to include new data as CCI/Triad, in its sole discretion, deems appropriate ("Database Updating Service"). Customer's license to use the Database Products shall continue so long as Customer subscribes to a CCI/Triad-authorized database updating service, unless such license expires or is earlier terminated by either party as provided in this Agreement. Either party may terminate the license to use the Database Products and the subscription to the Database Updating Service without cause upon ninety (90) days prior written notice to the other party.

3.6A *Software License and Support Fees.* In consideration for the license granted to Customer with respect to the Software Products, Customer agrees to pay CCI/Triad the Total Software Investment as set forth on *Exhibit A* (accounting for any discount on the Initial System Price set forth on *Exhibit A*) and monthly license fees ("Monthly License Fees) in accordance with *Exhibit D* of this Agreement. Payment of the Monthly License Fees entitles Customer to receive Software Support Services for the Software Products pursuant to Section 6 below. Customer acknowledges and agrees that its right to use the Software and receive Software Support Services is subject to payment of the Monthly License Fees and that Monthly License Fees are payable for the term of this Agreement, regardless of whether Customer is using the Software.

3.7 *Database Fees.* In consideration for the license granted to Customer under this Agreement with respect to the Database Products, Customer agrees to pay CCI/Triad monthly license and subscription fees ("Database Fees") for the relevant Database Products based on CCI/Triad's then-current pricing for such Database Products. CCI/Triad may increase Database Fees upon thirty (30) days prior written notice to Customer.

## 4. DELIVERY; INSTALLATION; TRAINING.

4.1 *Delivery.* Subject to the provisions of Section 8.1 ("Payment"), CCI/Triad will use its reasonable commercial efforts to ship the Products to the shipping address listed on the signature page of this Agreement in accordance with the delivery date agreed upon in writing by the parties. All shipping and handling charges will be paid initially by CCI/Triad, but billed separately to Customer. Customer assumes all risk of loss or damage to the Products upon delivery of same to the carrier.


4.2     *Installation and Training.* Unless designated by CCI/Triad as "Customer Installed" (in which case Customer is fully responsible for installation of such Hardware), CCI/Triad will use its reasonable commercial efforts to install the Hardware, or components thereof, promptly after delivery of the same to Customer. CCI/Triad will provide Customer, at no additional charge, with the installation and training services included on *Exhibit B*. Thereafter, CCI/Triad agrees to make available to Customer additional installation and training products and services for the Software at its then-current rate for such products and services. Customer is responsible, at its sole expense, for preparing and installing the operating environment for the Products, including power sources, electrical cabling, power filters, data cabling and telecommunication lines, prior to any installation of the Hardware by CCI/Triad. Unless otherwise specified by CCI/Triad or its supplier, Customer agrees to furnish or ensure the availability of all labor required for unpacking and placing the Hardware at the Shipping Location. Notwithstanding anything to the contrary in this paragraph, Customer agrees to reimburse CCI/Triad for any out-of-pocket expenses (*e.g.* travel, lodging, etc.) incurred by CCI/Triad in connection with providing installation and training services to Customer.

## 5.     ACCEPTANCE

5.1     *Acceptance Period.* The Products will be deemed accepted (i) automatically if Customer fails to notify CCI/Triad of its rejection of a CCI/Triad Product because of a Material Deficiency within ten (10) business days after the earlier of (a) the delivery of the relevant Products to Customer or (b) the Date of Installation; or (ii) on the date of Customer's execution of a certificate of acceptance, whichever occurs first. Customer acknowledges that ten (10) business days is a reasonable and sufficient period of time for Customer to examine the Products for purposes of acceptance or rejection. "Material Deficiency" is defined as a defect in the CCI/Triad Product which causes the CCI/Triad Product to materially fail to perform in accordance with the applicable Documentation.

5.2     *Rejection.* If, within the ten (10) day acceptance period, Customer notifies CCI/Triad in writing of Customer's rejection of a CCI/Triad product pursuant to Section 5.1, as Customer's sole remedy CCI/Triad will have thirty (30) days from the date of such notice either to correct the Material Deficiencies identified by Customer, or refund the purchase price or fees paid by Customer, if any, for such product and accept the return, at CCI/Triad's expense, of the rejected product.

5.3     *Customer's Wrongful Rejection of the Products.* If Customer improperly or wrongfully rejects the delivery of the Products or, improperly or wrongfully revokes acceptance of the Products, or does not pay all amounts due CCI/Triad for the acquisition of the Products pursuant to the terms of this Agreement, then CCI/Triad shall have all the rights provided to a "Seller" and a "secured party" under the Uniform Commercial Code (the "UCC"), including but not limited to, the right to repossess and resell the Products, and recoup lost profits and expenses incurred as a result of such actions by Customer.

## 6.     SUPPORT SERVICES.

6.1     *Software Support Services.*

(a)     *Coverage.* Subject to and in consideration of the terms and conditions of this Agreement, including payment of the applicable fees, CCI/Triad will provide to Customer the services described below ("Software Support Services") for the Software and ULT PLUS Software. The Software Support Services will commence upon the latter of the date of installation of the Software (if installed by CCI/Triad) or the date of CCI/Triad's invoice for such Software Software Support Services for the Software shall consist of: (i) the provision of periodic Updates to Customer, as determined by CCI/Triad; (ii) the provision, at Customer's request, of Enhancements (it being understood that CCI/Triad will notify Customer of the availability of an Enhancement and that CCI/Triad may, in its discretion, charge an additional license fee for Enhancements); (iii) access by telephone to CCI/Triad's Customer Support Center ("Center") for the Software during "Service Hours" (as defined below) for problem reporting and consultation regarding the proper use of the Software; and (iv) the correction of "Software Errors." For purposes of Support Services, a "Software Error" shall refer to a failure of the Software which is identified in writing by Customer, in sufficient detail to permit CCI/Triad to reproduce the failure, and which causes the Software to materially fail to perform in accordance with the Documentation.

(b)     *Customer Responsibilities.* Customer shall be responsible for ensuring that the Hardware is equipped with the communications equipment and telephone lines necessary to enable CCI/Triad to gain remote access to the Software for the purposes set forth in this Agreement. In addition, Customer shall be responsible for the proper back-up and security of the Software and Customer's associated Customer agrees to operate with the Center's staff, designate account representative to coordinate all of Customer's


service requirements, and perform all problem analysis procedures requested by CCI/Triad. Customer acknowledges that CCI/Triad's ability to provide Software Support Services is dependent upon Customer's proper maintenance of the Hardware. Customer agrees that it has full responsibility for obtaining and maintaining, including payment of all charges incurred by Customer with respect thereto, all telecommunication lines required for operation of the computer equipment and software provided to it under this or any other agreement.

6.2     *Hardware Support Services*

(a)     *Coverage.* CCI/Triad will provide the services described below ("Hardware Support Services") (within the continental United States) under the terms and conditions of this Agreement for Supported Hardware. Hardware Support Services for the Supported Hardware shall commence as of the later of the effective date of the relevant Hardware Support List or the day following expiration of the relevant warranty, if any, for the Supported Hardware. Subject to and in consideration of the terms and conditions of this Agreement, CCI/Triad will use its reasonable commercial efforts to make all adjustments and repairs during Service Hours (as defined in Section 6.3(a) below required to keep the Supported Hardware in good working order as described below. Hardware Support Service shall consist of: (i) scheduled cleaning and preventive service based upon the specific needs of the Supported Hardware, as determined by CCI/Triad; (ii) unscheduled, on-call remedial service, in response to Customer's request and as deemed necessary by CCI/Triad; (iii) lubrication, adjustment and replacement of parts and units deemed necessary by CCI/Triad; (iv) refinement of electronics as deemed necessary by CCI/Triad; (v) provision of back-up hardware for Supported Hardware not repaired on site within a reasonable time; (vi) installation of mandatory engineering changes to the Supported Hardware; (vii) telephone access during Service Hours to the Center for problem reporting and consultation concerning the Supported Hardware; and (viii) except as set forth below, all labor and travel expenses incurred during the performance of these services. CCI/Triad reserves the right to subcontract for the performance of any or all of the services provided hereunder to subcontractor(s) of CCI/Triad's choosing. Notwithstanding the foregoing, the specific services available for Vendor Hardware may vary from Vendor to Vendor and change from time-to-time. If *Exhibit B* provides for Customer's purchase of a hardware warranty/support plan for Hewlett-Packard hardware, Customer will receive support directly from Hewlett-Packard pursuant to such plan.

(b)     *Hardware Support Fee.* Customer agrees to pay Hardware Support Fees for the Supported Hardware in accordance with the payment terms set forth in Section 8 ("Payment Terms") below. The amount of the Hardware Support Fee for each item of Supported Hardware, or collectively, as the case may be, shall be in accordance with CCI/Triad's then current pricing unless otherwise provided on the relevant Hardware Support List. All Hardware Support Fees are payable monthly in advance, on the tenth (10th) day of each month during the term of this Agreement.

6.3     *Support Service Limitations.*

(a)     *Service Hours.* CCI/Triad will make Support Services available to Customer during the Center's then-regular service hours for the relevant service, excluding CCI/Triad recognized holidays ("Service Hours"). CCI/Triad will also make Software Support Services available to Customer outside of Service Hours as an Additional Service, as provided in Section 7 ("Additional Services") below.

(b)     *Services Specifically Not Included.* Support Services shall not include, by way of example only and not limitation, the services listed in subsections (i) - (x) below. To the extent that CCI/Triad provides any of the services listed below to Customer, the provision for Additional Services set forth in Section 7 ("Additional Services") shall apply. Support Services shall not include:

(i)     any changes, modifications, alterations in or to the Supported Products, except as provided in Section 6.1 or Section 6.2 above;

(ii)     any services associated with the relocation, installation or de-installation of the Supported Products, or the provision of on-site repairs at a location other than a Site;

(iii)     any services if the Supported Products have been modified, in whole or in part, by any party other than CCI/Triad;

(iv)     any services resulting from (1) catastrophe, accident, neglect, misuse, improper or unauthorized use, f .., alteration or negligence, in whole or in part, by Custom ·, its employees or agents; ( .s external to the Supported Products(such as, for example, the operation of programs other t! .ne



Software, equipment failures, or power fluctuations or failures); (3) the failure of Customer to provide a suitable operating environment for the Supported Products; (4) any use of the Supported Products other than ordinary use or as permitted under this Agreement; (5) causes due to Customer's failure to back-up or otherwise protect (as described in the Documentation or the documentation provided by Customer's operating system vendor) the Software and associated Customer data; or (6) attempted repairs by a party other than CCI/Triad (or a party authorized by CCI/Triad);

(v)     the re-creation of data lost for any reason whatsoever;

(vi)     the support of any version of the Software, other than the current release and its immediate generally released predecessor;

(vii)     support services relating in any way whatsoever to any software programs, other than the Software, except to the limited extent necessary for CCI/Triad to analyze whether a reported problem is caused by the Software;

(viii)     support services relating in any way whatsoever to any operating system software, except to the limited extent necessary for CCI/Triad to analyze whether a reported problem is caused by the Software;

(ix)     repair or service of the Supported Products where doing so would be hazardous to the health or safety of CCI/Triad's employees or contractors, or where doing so would be impractical to render because of alterations in, or attachments to, the Supported Products; or

(x)     electrical work external to the Supported Products or the provision of consumables or supplies, such as ribbons, disc cartridges and paper and other similar items, normally used in operation.

(c)     *No Warranty of Uninterrupted Operation.* CCI/Triad does not, and cannot, warrant that the operation of the Supported Hardware will be uninterrupted or error free. CCI/Triad will not be liable for any failure or delay in performance under this Agreement which might be due, in whole or in part, directly or indirectly, to any contingency, delay, failure, or cause of, any nature beyond its reasonable control.

(d)     *Condition.* The initiation or reinstatement of Support Services shall be subject to CCI/Triad's then-current inspection and initiation policy and any associated charges. In particular, the hardware must be in good working order, as determined by CCI/Triad, on the effective date of any coverage of Support Services under this Agreement.

(e)     *Replacement Parts.* In the course of providing Hardware Support Services, CCI/Triad may replace failing parts with replacement parts. The replacement parts will either be new or serviceable parts which are equivalent to new in performance, as determined by CCI/Triad in its sole discretion. All replaced parts shall be the property of CCI/Triad (or its contractor).

6.4     *Responsibilities Of Customer.*

(a)     *Customer Representative.* Customer will designate an account representative to coordinate all of Customer's hardware service requirements. The person signing this Agreement on behalf of Customer will be Customer's account representative until Customer notifies CCI/Triad otherwise in writing. The account representative will seek to minimize repetitive telephone calls in order to maximize efficient response to such inquiries by CCI/Triad.

(b)     *Access.* If Support Services or Additional Services are rendered at the Site, Customer will provide, free of charge and with full and free access, adequate storage space for tools, test and maintenance equipment, working space, heat, light, ventilation, electrical current and outlets, and data and voice communications facilities for the use of CCI/Triad's (or CCI/Triad's contractor's) Customer Service personnel. All test and maintenance equipment, tools and maintenance documentation will be the property of CCI/Triad (or its contractor, as the case may be) and may be removed by CCI/Triad or its contractor at any time. CCI/Triad will use reasonable efforts to comply with reasonable security procedures established by the Customer.

(c)     *Notification of Failure.* Customer will promptly notify the Center of any failure of Supported Products. Before requesting such service, Customer agrees to follow the problem determination, problem analysis and service request procedures provided by CCI/Triad. CCI/Triad reserves the right to verify that Support Services are required for the Supported Products, or that Supported Hardware is acceptable for exchange.



If the Customer does not elect to have CCI/Triad restore any Supported Hardware damaged in accordance with the terms of this Agreement, CCI/Triad will have the right, at its option, to terminate its obligations under this addendum pertaining to that damaged Supported Hardware.

(d) *Cooperation.* Customer agrees to perform certain duties and services as may be reasonably directed by CCI/Triad in response to telephone problem reports such as system restarts, recording of error information and running of operational readiness tasks. Except to the extent covered under this Agreement, Customer will remove or implement other safeguards to protect all programming, programs, data and removable storage media, and all other parts, alterations, or attachments (if any) before the Supported Hardware is presented for service or exchange.

(e) *Hardware Exchange.* CCI/Triad may elect to exchange, rather than repair, Supported Hardware. However, Customer will not present, and CCI/Triad will not accept, Supported Hardware for exchange which is defaced, altered, in need of repair not included in this Agreement, or damaged beyond repair. Customer represents and warrants that any Supported Hardware presented for exchange will be free from all liens, security encumbrances or other encumbrances held by any third party.

(f) *Unauthorized Repairs.* Customer will not make, alter, or attempt to make repairs or alterations, or perform maintenance or cause repairs to be made, or have maintenance performed by third parties on the Supported Hardware during the term of this Agreement, except as specified in this Agreement or as may be approved in advance and in writing by CCI/Triad. If, in the opinion of CCI/Triad, any unauthorized alterations, additions, adjustments to, or repair of the Supported Hardware adversely affect CCI/Triad's ability to render maintenance service to the Supported Hardware, CCI/Triad reserves the right to terminate this Agreement immediately upon written notice to Customer.

(g) *Environment; Housekeeping.* During the term of this Agreement, Customer will provide a suitable environment for the Supported Hardware and will ensure that such hardware remains in conformity with the minimum configuration requirements, if any, in effect upon commencement date of the Hardware Support Services. Customer will perform all services of a housekeeping nature including, but not limited to, cleaning of storage devices, keyboards, monitor screens and ventilation passages.

(h) *Operating System Software.* During the term of this Agreement, Customer agrees to maintain the prevailing current version of the operating system software for the Supported Hardware, if applicable, or such other version required by CCI/Triad for proper operation of the Supported Hardware. Customer acknowledges and understands that support services for the relevant operating system software for the Supported Hardware is available from third parties and not from CCI/Triad.

7. **ADDITIONAL SERVICES.** Customer may request, and CCI/Triad may elect to provide, Additional Services. The fee for Additional Services shall be in addition to the Monthly License Fees and any Hardware Support Fee and will be invoiced to Customer at an additional charge based upon CCI/Triad's then-current rates. Labor for services provided at a Site will be charged at CCI/Triad's then-current hourly service rates and minimum charges for service time, including travel time and charges for shipping expenses, as applicable. In addition, Customer will be charged for waiting time spent by any CCI/Triad employee at a Site, including any time resulting from the denial by Customer of access to the Software or Hardware to be serviced.

8. **PAYMENT TERMS.**

8.1 *Payment.* Except as otherwise provided in this Agreement, Customer agrees to pay all amounts due to CCI/Triad within ten (10) days after the date of CCI/Triad's invoice. Customer agrees to pay for Hardware and the Initial License Fee for Software Products acquired under this Agreement ("Initial System Price") as follows (whether or not invoiced): Ten Percent (10%) of the Initial System Price upon the signing of this Agreement; Twenty-five Percent (25%) of the Initial System Price upon the delivery of the Hardware and Software Products to Customer's Site; Fifty Percent (50%) of the Initial System Price once the Hardware and Software Products are installed and certified by CCI/Triad as available for use by Customer ("Live Date") and Fifteen Percent (15%) upon completion of the first month-end billing cycle for which Customer has the Hardware and Software Products available for use. Monthly fees are due on the tenth day of each calendar month during the term of the license or service covered by the fee. Except as otherwise provided in this Agreement, CCI/Triad may increase the amount of any monthly fees on thirty (30) days advance written notice. CCI/Triad may, at any time, when, in its opinion, the financial condition of Customer warrants it, either alter or suspend credit terms and delay delivery of Product



8.2 *Taxes.* Customer agrees to pay, and to indemnify and hold CCI/Triad harmless from, any sales, use, excise, import or export, value added or similar tax or duty not based on CCI/Triad's net income as well as the collection or withholding thereof, including penalties, interest, as well as any costs associated with the collection or withholding thereof, and all government permit or license fees and all customs and similar fees which CCI/Triad may incur with respect to this Agreement, and any costs associated with the collection of the foregoing items.

8.3 *Security Interest.* To secure payment of any amounts due to CCI/Triad under this Agreement, CCI/Triad retains, and Customer hereby grants, a purchase money security interest in the Hardware. If requested, Customer agrees to promptly execute any documents required to perfect CCI/Triad's security interest as a first lien. Customer hereby authorizes CCI/Triad to act as Customer's agent for purposes of executing and/or filing any documents which CCI/Triad deems necessary to perfect CCI/Triad's security interest in the Hardware or to exercise its rights as a secured party under this Agreement.

8.4 *Late Payment Fee.* All amounts not paid when due under this Agreement will accrue interest at the lesser of 1.5% per month or the maximum rate permitted by law, on the unpaid balance until paid in full. Customer shall pay CCI/Triad any reasonable additional expenses incurred by CCI/Triad in collection efforts, including but not limited to collection agency, attorney and travel expenses.

8.5 *Purchase Orders.* The terms and conditions of this Agreement shall apply to, and shall supersede, any different or additional terms on any purchase order or report issued by Customer. Orders issued by Customer to CCI/Triad are solely for the purpose of identifying the product ordered, requesting quantities and delivery dates, and identifying site(s).

8.6 *Third Party Financing.* At any time prior to shipment of the Products, Customer may notify CCI/Triad in writing, subject to CCI/Triad's prior approval, that the Products will be acquired through a third party financing institution. Upon CCI/Triad's request, Customer must submit to CCI/Triad for prior approval all documentation relating to such acquisition by the third party financing institution and all documents relating to the transfer of possession of the Products, whether by lease or otherwise, by the third party financing institution to Customer. Approval of such documents and of the third party financing institution shall not alter the rights or obligations of CCI/Triad and Customer. The financing institution will acquire no interest in any Software Products nor any other rights under this Agreement.

9. **TITLE; RESTRICTIONS ON DECOMPILING.**

9.1 *Title.* Title to and ownership of all Proprietary Rights in the Software Products and Database Products, whether in object or source code form, as well as any works derived from the Software Products or Database Products, whether in object or source code form, will at all times be, and shall remain the property of CCI/Triad or its suppliers, as the case may be.

9.2 *Assignment of Derivative Works.* Customer assigns to CCI/Triad all right, title and interest in any derivative work(s) of the Software Products and Database Products, whether in object or source code form, created by or for Customer. Customer agrees to execute, upon CCI/Triad's request, a signed transfer of copyright and/or patent for any such derivative work(s), and to perform, during and after Customer's service to CCI/Triad, all acts necessary and desirable by CCI/Triad to permit and assist it, at CCI/Triad's expense, in perfecting and enforcing the full benefits, enjoyment, rights and title throughout the world in the assigned works. If CCI/Triad is unable to secure Customer's signature for any reason whatsoever to any lawful and necessary document required to apply for or execute any patent, copyright or other applications with respect to such derivative works, Customer hereby irrevocably appoints CCI/Triad and its duly authorized officers and agents as Customer's agents and attorney-in-fact to execute and file any such application or other document and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights or other rights thereon with the same legal force and effect as if executed by Customer.

9.3 *Restrictions on Decompiling.* Customer specifically agrees that it will not translate, disassemble, decompile or reverse engineer the Software Products or Database Products or any copy thereof, in whole or in part.

10. **CONFIDENTIAL INFORMATION.**

10.1 *Definition* Customer acknowledges that it may be exposed orally, in writing or by observation, to information relating to CCI/Triad's business and products which is the confidential and proprietary information of CCI/Triad ("Confidential Information") and which is not generally known to the public.



Confidential Information includes, without limitation, information concerning CCI/Triad's technology, products, research and development, software, file formats, production, manufacturing and engineering processes, business plans, finances, pricing, customers and employees. Customer acknowledges and agrees that the Software and Databases, in object or source code form, including the algorithms, structure and organization thereof, consist of Confidential Information. All Confidential Information is and shall remain the property of CCI/Triad or its suppliers, as the case may be.

10.2    *Confidential Obligations.* Customer agrees that it will (i) hold the Confidential Information in confidence; (ii) NOT use any Confidential Information except in accordance with the provisions of this Agreement; and (iii) NOT disclose the Confidential Information to any person, except officers, employees and independent contractors (who have signed a written agreement consistent with the terms of this Section 10) of Customer on a need-to-know basis, at any time, either during or after the term of the Agreement, without the prior written consent of CCI/Triad. Customer further agrees to immediately give notice to CCI/Triad of any unauthorized use or disclosure of the Confidential Information and to assist CCI/Triad in protecting its rights in the Confidential Information. Customer further agrees to treat all Confidential Information in the same manner as it treats its own confidential information of similar type, but in no case will the degree of care used by Customer be less than reasonable care. Customer agrees that this Agreement is Confidential Information of CCI/Triad.

## 11.    LIMITED WARRANTIES.

11.1    *Limited Warranty for New Hardware.*

(a)    *Vendor Hardware.* The limited warranty provided by the manufacturer of Vendor Hardware is the sole and exclusive warranty, express or implied, relating to the Vendor Hardware. Customer acknowledges and agrees that the limited warranty provided by such third party vendor/manufacturer ("Vendor") does NOT apply to Used Hardware. CCI/Triad will make available to Customer a copy of the relevant statement of limited warranty, if any, supplied by the relevant Vendor for Vendor Hardware purchased by Customer from CCI/Triad.

(b)    *CCI/Triad Hardware.* Except with respect to Used Hardware, CCI/Triad warrants that for a period of ninety (90) days after the relevant Date of Installation (the "Limited Warranty Period") that the CCI/Triad Hardware will be free of material defects in materials or workmanship. If the CCI/Triad Hardware is discovered to contain a defect in materials or workmanship, and Customer reports such defect to CCI/Triad during the Limited Warranty Period, CCI/Triad will, at its option, repair or replace the defective CCI/Triad Hardware. If CCI/Triad is unable to repair or replace the defective CCI/Triad Hardware, it will refund the price paid by Customer for such hardware. The limited warranty for the CCI/Triad Hardware set forth above shall NOT apply to CCI/Triad Hardware which: (i) has been modified, repaired or altered, except by CCI/Triad, (ii) has not been maintained in accordance with any environmental requirements supplied to Customer by CCI/Triad, or (iii) has been subjected to unusual physical or electrical stress, misuse, abuse, negligence or accident. Further, the limited warranty for CCI/Triad Hardware shall not apply to any consumable components or supplies, such as, by way of example only and not limitation, ribbons, bulbs, paper or removable disks. Any parts replaced by CCI/Triad shall become the property of CCI/Triad. THE FOREGOING IS CUSTOMER'S SOLE AND EXCLUSIVE REMEDY FOR BREACH OF WARRANTY BY CCI/TRIAD WITH RESPECT TO THE CCI/TRIAD HARDWARE.

(c)    *Disclaimer of Warranty for Used Hardware.* CCI/TRIAD PROVIDES ALL USED HARDWARE STRICTLY ON AN AS-IS BASIS. CCI/TRIAD MAKES NO WARRANTIES, WHETHER EXPRESS, IMPLIED OR STATUTORY, IN CONNECTION WITH THE USED HARDWARE. CCI/Triad will, to the extent it is permitted to do so, pass through any warranty which CCI/Triad may obtain from its supplier of Used Hardware.

11.2    *Limited Warranty for Software.* CCI/Triad warrants that the Software provided to Customer in connection with the initial installation of the Hardware, and specific Enhancements provided to Customer for which a charge separate from the Monthly License Fees applies (together referred to as "Warranted Software"), will perform substantially in accordance with the Documentation for a period of ninety (90) days after installation on the Hardware (the "Software Warranty Period"). All other Software is strictly provided to Customer on an "AS IS" basis. If the Warranted Software is discovered not to perform substantially in accordance with such Documentation and Customer reports such failure to CCI/Triad during the Software Warranty Period, CCI/Triad will use reasonable commercial efforts to provide Customer with a correction or a workaround for such failure or, at CCI/Triad's option, CCI/Triad will refund to Customer the license fee paid by Customer for the Warranted Software. This limited warranty shall not apply if the Warranted software has been modified without CCI/Triad's express authorization, by any party other than CCI/Triad,


or if the failure results from the operation of the Warranted Software in conjunction with software or hardware products not provided by CCI/Triad. THE FOREGOING IS CUSTOMER'S SOLE AND EXCLUSIVE REMEDY FOR BREACH OF WARRANTY BY CCI/TRIAD WITH RESPECT TO THE SOFTWARE PRODUCTS.

11.3. *No Warranty on Databases* The data and information comprising the Databases is based on information supplied to the automotive aftermarket by the individual parts manufacturers and certain other suppliers. ALTHOUGH CCI/TRIAD WILL USE REASONABLE COMMERCIAL EFFORTS TO ENSURE THE ACCURACY OF THE DATA AND INFORMATION COMPRISING THE DATABASES, CCI/TRIAD MAKES NO REPRESENTATIONS, WARRANTIES (EXPRESS, IMPLIED OR STATUTORY) OR COVENANTS WITH RESPECT TO THE CONDITION, QUALITY, PERFORMANCE OR ACCURACY OF DATA OF ANY KIND OR THE CAPACITY, TIMELINESS, DURABILITY OF DESIGN, OR SUITABILITY OF DATABASES. DATABASES ARE LICENSED SOLELY ON AN "AS IS" BASIS. IN PARTICULAR, CCI/TRIAD DISCLAIMS ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE AND/OR WARRANTY OF MERCHANTABILITY WITH RESPECT TO DATABASES.

11.4 *DISCLAIMER OF WARRANTY.* EXCEPT FOR THE EXPRESS WARRANTIES, IF ANY, PROVIDED IN THIS SECTION 11, NEITHER CCI/TRIAD NOR ITS VENDORS MAKE ANY WARRANTIES, WHETHER EXPRESS, IMPLIED OR STATUTORY, AS TO ANY OTHER MATTER WHATSOEVER UNDER THIS AGREEMENT. IN PARTICULAR, ANY AND ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY DISCLAIMED.

## 12. INDEMNITY.

12.1 *Indemnity by CCI/Triad.* CCI/Triad agrees to defend and otherwise hold Customer harmless from all claims by third parties alleging that the Software, or any part thereof, furnished and used within the scope of this Agreement infringes a United States patent or a United States copyright. The foregoing obligation is contingent upon Customer giving CCI/Triad prompt written notice of any such claim, tendering the defense of any such claim to CCI/Triad, providing CCI/Triad with full cooperation for the defense of same, and not settling without CCI/Triad's prior written approval. In the event the Software is held or is believed to infringe, CCI/Triad may, at its sole option and expense, elect to (i) procure for Customer the right to continued use of the Software as provided hereunder, (ii) modify the Software such that it is no longer infringing or (iii) terminate the license for the infringing Software and refund the license fees paid by Customer for such Software. CCI/Triad will have no liability to Customer if any alleged infringement of Proprietary Rights or claim thereof is based upon (w) modification of the Software by Customer or any third party, (x) use of the Software in connection or in combination with equipment, devices or software not delivered by CCI/Triad and such infringement or claim could have been avoided by the use of the Software with other equipment, devices or software, (y) use of any Software in a manner for which it was not intended, or (z) use of other than the most current release of the Software if such claim would have been prevented by the use of such release. THE FOREGOING STATES CCI/TRIAD'S SOLE AND EXCLUSIVE OBLIGATION, WHETHER EXPRESS, IMPLIED, OR STATUTORY, WITH RESPECT TO ANY CLAIM OR ALLEGED INFRINGEMENT OF ANY PROPRIETARY RIGHTS OF ANY KIND.

12.2 *Indemnity by Customer.* Customer agrees to defend and otherwise hold CCI/Triad harmless from all claims, actions, suits or proceedings, including all costs, expenses, damages, attorneys' fees or other liabilities arising out of, connected with or resulting from Customer's breach (or the breach by Customer's employees, agents, consultants or permitted assignees) of any obligation under this Agreement, including, without limitation, any breach of any license granted under this Agreement, any breach of Customer's obligations due CCI/Triad under governing law, or any litigation commenced against CCI/Triad arising out of this Agreement in which CCI/Triad ultimately prevails.

## 13. LIMITATIONS OF LIABILITY.

13.1 *Damages.* TO THE MAXIMUM EXTENT PERMITTED BY LAW, CUSTOMER AGREES AND STIPULATES THAT AS A MATERIAL TERM AND IN CONSIDERATION OF THIS AGREEMENT, IN NO EVENT WILL CCI/Triad BE LIABLE OR OBLIGATED IN ANY MANNER FOR, AND CUSTOMER WAIVES ALL RIGHTS TO, ANY INCIDENTAL, SPECIAL, INDIRECT, PUNITIVE, CONSEQUENTIAL, EXEMPLARY DAMAGES IN CONNECTION WITH OR ARISING OUT OF



THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY DAMAGES RESULTING FROM LOSS OF PROFITS, DATA, GOODWILL OR BUSINESS REPUTATION, WHETHER SUCH DAMAGES OR LOSSES ARISE IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, OR ARE SUFFERED DIRECTLY OR INDIRECTLY, EVEN IF CCI/TRIAD IS INFORMED OF THE POSSIBILITY OF SUCH DAMAGES IN ADVANCE. ALL SUCH DAMAGES ARE EXPRESSLY DISCLAIMED, WAIVED AND RELEASED AS A MATERIAL CONDITION OF AND AS CONSIDERATION FOR THIS AGREEMENT.

13.2    *Limitation of Amount.*  Notwithstanding any other provisions of this Agreement, in no event will CCI/Triad's liability in connection with the products or services provided under this Agreement, or otherwise in connection with this Agreement, exceed the amounts actually paid to CCI/Triad by Customer under this Agreement during the twelve (12) month period immediately preceding the occurrence of the event giving rise to the claim against CCI/Triad.  This limitation is cumulative, with all payments to Customer for claims or damages being aggregated to determine satisfaction of the limit.  The existence of one or more claims will not enlarge this limitation on amount.

13.3    *Limitation on Time to Sue.*  All disagreements or controversies of any kind, whether claimed in tort, contract or otherwise, either concerning this Agreement or any other matter whatsoever, shall be brought within one (1) year after the accrual of the disagreement or controversy.

14.    **PROPRIETARY NOTICES.**  Customer agrees not to remove, alter or destroy any form of copyright notice, logo, trademark, trade name, proprietary markings or confidentiality legends placed upon or contained within the Products, or any containers, related materials or documentation.

15.    **INJUNCTIVE RELIEF.**  It is expressly agreed that a breach of any provision of this Agreement relating to CCI/Triad's intellectual property rights will cause irreparable harm to CCI/Triad and that a remedy at law would be inadequate. Therefore, in addition to any and all remedies available at law, CCI/Triad will be entitled to an injunction or other equitable remedies in all legal proceedings in the event of any threatened or actual violation of any or all of the above provisions.

16.    **COMPLIANCE WITH U.S. LAWS AND REGULATIONS.** Customer acknowledges that the laws and regulations of the United States may restrict the export and re-export of commodities and technical data of United States origin.  Customer is not permitted to export the Products without the prior consent of CCI/Triad and, in any case, Customer agrees and hereby assures CCI/Triad that Customer will not export or re-export any Products in any form without the appropriate authorization, if required, of the Office of Export Administration ("OEA") to Afghanistan, the People's Republic of China or to any Group Q, S, W, Y or Z country specified in Supplement No. 1 to Section 770 of the OEA Regulations as amended from time to time.  Customer agrees to comply with all other applicable international, federal, state and local laws and regulations.

17.    **TERM AND TERMINATION.**

17.1    *Term.*  Unless terminated earlier as provided herein, the term of this Agreement will begin on the Effective Date and will continue in force for a period of seven (7) years ("Initial Term").  Following the Initial Term, this Agreement may be renewed for an additional term of five (5) years.  Thereafter, this Agreement may be renewed annually for additional and successive one (1) year terms to commence on the respective anniversary of the date of expiration of the Initial Term.  The five year renewal term and subsequent one year renewal terms are hereinafter referred to as "Renewal Terms."  Such Renewal Terms will occur automatically unless either party notifies the other, at least thirty (30) days prior to the expiration of the expiring term, of such party's decision not to exercise its renewal option.

17.2    *Termination.*  The following provisions provide for the termination of the Agreement:

(a)    *Insolvency.*  CCI/Triad may terminate this Agreement effective immediately and without liability upon written notice to Customer if Customer (i) fails to pay its obligations to its creditors as they generally become due; (ii) declares bankruptcy; (iii) becomes the subject of any proceedings seeking relief, reorganization, or rearrangement under any laws relating to insolvency; (iv) makes an assignment for the benefit of creditors; or (v) commences the liquidation, dissolution, or winding up of its business.

(b)    *Default.*  Either party may terminate this Agreement if the other party materially breaches this Agreement and fails to correct such breach within thirty (30) days' written notice specifying the breach. CCI/Triad may immediately terminate Agreement, including, without limitation, any licenses for the


Software Products, and the providing of support services, without further obligation to Customer, if (i) Customer is delinquent in making payments due to CCI/Triad, or (ii) Customer breaches its obligations under Sections 3 ("License"), 9 ("Title; Restrictions on Decompiling"), 10 ("Confidential Information") 14 ("Proprietary Notices"); or (iii) Customer is in default under any other agreement between Customer and CCI/Triad or any of CCI/Triad's subsidiaries or affiliated entities.

17.3 *Rights Upon Expiration or Termination.* Upon the expiration or termination of this Agreement for any reason:

(a) All rights granted to Customer hereunder, including, without limitation, all licenses granted by CCI/Triad with respect to the Software Products and Database Products, shall immediately cease and Customer shall immediately (i) return to CCI/Triad all Confidential Information (including, without limitation, all copies of the Software Products), in Customer's possession or under Customer's control; (ii) purge all copies and portions of such Confidential Information from Customer's computer storage media or any other location on or in which Customer has placed such Confidential Information; and (iii) give CCI/Triad, at CCI/Triad's request, a written certification that Customer has complied with all of its obligations set forth in this section. Customer grants CCI/Triad, upon termination of Customer's right to Use the Software Products for any reason, the right to remove and/or disable the Software, either personally at Customer's premises or by remote communications.

(b) Customer will within ten (10) days after the date of expiration or termination pay to CCI/Triad any monies due under this Agreement.

17.4 *Survival.* Notwithstanding anything to the contrary in this Agreement, the rights and obligations under Sections 8.2 ("Taxes"), 8.3 ("Security Interest"), 8.4 ("Late Payment Fee"), 9 ("Title; Restrictions on Decompiling"), 10 ("Confidential Information"), 11.4 ("Disclaimer of Warranty"), 13 ("Limitations of Liability"), 14 ("Proprietary Notices"), 15 ("Injunctive Relief"), and 16 ("Compliance with U.S. Export Laws"), and any payments due hereunder will survive expiration or termination of this Agreement.

## 18. GENERAL PROVISIONS.

18.1 *Choice of Law.* This Agreement will be governed by and construed in accordance with the laws of the State of Texas (except that body of law controlling conflicts of law). Both parties agree that this agreement shall be performable in Travis County, Texas. The parties agree that the United Nations Convention on Contracts for the International Sale of Goods (1980) is specifically excluded from application to this Agreement.

18.2 *Force Majeure.* Neither party shall be responsible for any liabilities, loss or damage to the other party or others (except for the payment of money) arising out of or in connection with strikes, riots, fire, insurrections, inability to obtain delivery of parts, supplies or labor, wars, acts of civil or military authorities, restraints of governments, acts of the elements, embargoes, failures of carriers or public utilities, acts of God or of the public enemy or any cause beyond the reasonable control of either party. If such delay continues for more than one hundred eighty (180) days, either party may thereafter, by notice to the other party, terminate this Agreement.

18.3 *Allocation of Risk.* THE SECTIONS ON LIMITATION OF LIABILITY, LIMITED WARRANTIES AND DISCLAIMER OF WARRANTY ALLOCATE THE RISK OF FAILURE BETWEEN THE PARTIES. THIS ALLOCATION IS REFLECTED IN THE PRICING OF THE PRODUCTS DETAILED IN THIS AGREEMENT AND IS AN ESSENTIAL ELEMENT OF THE BASIS OF THE BARGAIN BETWEEN THE PARTIES.

18.4 *Waiver.* The waiver by either party of a breach of any provision contained herein shall not be effective unless in writing. Any waiver shall in no way be construed as a waiver of any succeeding breach of such provision or the waiver of the provision itself.

18.5 *Severability.* In the event that any provision of this Agreement shall be deemed unenforceable or invalid under any applicable law or be so held by applicable court decision, such unenforceability or invalidity shall not render this Agreement unenforceable or invalid as a whole, and, in such event, such provision shall be changed and interpreted so as to best accomplish the intended objectives and economic effects of such unenforceable or invalid provision, within the limits of the applicable law or court decisions.



18.6     *Assignment.*  This Agreement may not be assigned by Customer without the prior written consent of CCI/Triad and in accordance with the terms contained herein. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

18.7     *Notice.*  All notices, reports, approvals and other communications permitted or required under this Agreement shall be in writing and may be delivered (a) personally, (b) by confirmed telex or telecopier, (c) by commercial overnight courier with written verification or receipt, or (d) by certified or registered mail, return receipt requested, postage prepaid. Notices delivered personally, by telex or telecopier or by overnight courier shall be deemed to be received on the first business day following the date of delivery. Notices sent by registered or certified mail shall be treated as having been received upon the earlier of actual receipt or five (5) days after posting during a period of uninterrupted service. Notices shall be sent to the addresses set forth in this Agreement or such other address as either party may specify in writing.

18.8     *Attorneys' Fees.*  In the event any proceeding or lawsuit is brought by either party in connection with this Agreement, the prevailing party in such proceeding shall be entitled to receive its costs, expert witness fees and reasonable attorneys' fees, including costs and fees on appeal.

18.9     *Arbitration.* **Any claim, dispute or controversy arising out of or relating to this Agreement, or the alleged breach or termination thereof, will be settled by arbitration conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association, as then in effect, except as provided in subparagraphs (i)–(iv) below. Customer understands that by agreeing to arbitrate disputes, Customer is waiving its right to a jury trial.**

        (i)       Any such arbitration shall be held in Travis County, Texas, before one arbitrator who will be selected by mutual agreement of the parties; if agreement is not reached on the selection of an arbitrator within fifteen (15) days after receipt of a demand for arbitration by the other party (the "Initial Selection Period"), then each party will have fifteen (15) days from the expiration of the Initial Selection Period to select an arbitrator. The two arbitrators will select a third neutral arbitrator and the three arbitrators will arbitrate the dispute. If either party does not timely select an arbitrator, the arbitrator selected by the other party will arbitrate the dispute.

        (ii)      The parties will provide each other with production of all requested documents and records reasonably related to the dispute in a manner that will minimize the expense and inconvenience of both parties. Discovery will not include depositions or interrogatories except as the arbitrator(s) expressly allow(s) on a showing of need.

        (iii)     Costs and fees of the arbitrator(s) will be borne by the non-prevailing party, unless the arbitrator(s) determine(s) otherwise. The award of the arbitrator(s), which may include equitable relief, will be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof. Any demand for arbitration shall be made in writing and must be made within one (1) year after the accrual of the dispute or controversy.

        (iv)     Nothing in this Section 18.9 will be deemed as preventing CCI/Triad from seeking injunctive or equitable relief (or any other provisional remedy) from any court having jurisdiction over the parties and the subject matter of the dispute as necessary to protect CCI/Triad's proprietary rights and confidential information.

18.10    *Counterparts.*  This Agreement may be executed in counterparts, each of which shall be considered an original, but all of which, when taken together, shall constitute one and the same instrument.

18.11    *Entire Agreement.*  This Agreement and the addenda, supplements and exhibits to this Agreement contain the entire agreement between the parties relating to this subject matter and supersede all prior or simultaneous oral or written agreements regarding the subject matter of this Agreement. No modifications or amendments to this Agreement shall be binding upon the parties unless made by a writing signed by both parties.